UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

TRAVIS MCKEOWN                                     CIVIL ACTION

VERSUS                                             NO. 12-2041

UNUM LIFE INSURANCE COMPANY                        SECTION F
OF AMERICA

ORDER AND REASONS

Before the Court is the defendant's motion for summary judgment on the administrative record.  For the reasons that follow, the motion is GRANTED.

Background

This dispute arises out of an insurance company's allegedly improper termination of a claimant's long-term disability benefits.

Travis McKeown, while employed by GulfMark Americas, Inc., suffered a herniated disc on August 21, 2009 while working aboard the MV EAGLE.  As a result, on January 26, 2010, McKeown submitted a claim for disability benefits under GulfMark's long-term disability policy issued by Unum Life Insurance Company of America.  It is undisputed that Unum's disability policy is governed by the Employee Retirement Income Security Act (ERISA).

McKeown was first treated by Dr. Rafael Santiago, a pain specialist, who advised McKeown not to lift or carry greater than twenty pounds, and to avoid sitting, standing, and walking for

1

greater than one hour.  In addition, Dr. Santiago referred McKeown to a surgeon.  On January 27, 2010, McKeown underwent surgery for an L5-S1 disc herniation.  Dr. Thomas Freeman, the neurosurgeon who performed McKeown's surgery, stated that McKeown would be unable to work for two months after the surgery.  And for five months post-surgery, he was instructed not to lift, push, or pull greater than twenty pounds, and to refrain from twisting.  After five months, however, Dr. Freeman indicated that McKeown would be able to return to work "full duty."

Unum acknowledged receipt of McKeown's claim on February 12, 2010, noting that McKeown had been previously approved to receive short-term disability benefits, and that McKeown had undergone surgery in January 2010.  Unum began the process of gathering information to determine whether McKeown qualified for long-term disability benefits, resulting in a lengthy administrative record, which is now summarized below.

A.   *McKeown's Application for Long-Term Disability Benefits*

To begin the claims process, GulfMark provided Unum with a written job description that outlined McKeown's duties, which include, but are not limited to:

> 1.    The routine upkeep, care, and cleanliness of the vessel, the hull above the waterline, masts, decks, bulkheads, ladders, superstructures, and accommodations, includes cleaning, chipping, and painting.
> 2.    Standing bridge or lookout watches.
> 3.    Assisting in the mooring and anchoring of the vessel.

Based on this job description, a vocational rehabilitation consultant performed an analysis on March 3, 2010, which concluded that McKeown's occupation, as performed in the national economy, was the most similar to that of ship captain, defined as an individual who "commands ships to transport passengers, freight, and other cargo across oceans, bays, lakes, and in coastal waters."  The vocational analysis noted:

> This occupation is performed in the [l]ight level of exertion, defined as "[e]xercising up to 20 pounds of force occasionally, and/or up to 10 pounds of force frequently, and/or a negligible amount of force constantly to move objects. Physical demand requirements are in excess of those for [s]edentary [w]ork." Additional physical requirements of the occupation include occasionally standing, walking, climbing, balancing, fingering, keyboard use; frequent reaching, sitting, talking, handling, hearing, use of near and far visual acuity, use of depth perception and visual accommodation.

Unum conducted an initial telephone interview with McKeown on March 12, 2010, in which McKeown told Unum that he first experienced back pain in August 2009, but he continued to work until December 3, 2009 when he could no longer do so.  McKeown also questioned Dr. Freeman's statement that he would be able to return to "full duty" five months post-surgery, stating that he was currently in so much pain that he could not imagine returning to work on a vessel.  McKeown also stated that his job duties exceeded those outlined in Unum's vocational analysis, which was based on the job description provided by GulfMark.  McKeown asserted that he was required to do a significant amount of

3

twisting, and participate in the crew-wide responsibility of loading groceries on the boat, which required going up and down a flight of stairs, often with boxes weighing more than seventy-five pounds.

After Unum's telephone conversation with McKeown, Unum contacted GulfMark regarding McKeown's occupational duties. GulfMark agreed with McKeown that the requirements of his job were heavier than those listed in the previous job description. Unum requested a more accurate job description so as to properly evaluate McKeown's claim.

GulfMark provided an updated job description for a master/lead captain, and Unum performed an updated vocational analysis on April 5, 2010.  The vocational consultant concluded that McKeown's occupation was most consistent in the national economy with the enhanced occupational title "Master Bays Sounds & Lake" (Ship Master; Ship Captain).  The physical demands were also classified as "light work."  The position involved "[l]ifting, [c]arrying, [p]ushing, [p]ulling 20 Lbs. occasionally, frequently up to 10 Lbs., or negligible amount constantly.  Can include walking and or standing frequently even though weight is negligible.  Can include pushing and or pulling of arm or leg controls."

On March 15, 2010, McKeown reported to Dr. Freeman that his condition was getting worse.  Dr. Freeman stated that another MRI

would be taken in two months to determine if there was any residual or recurrent disc herniation.  In addition, Dr. Freeman indicated that he would place McKeown at maximum medical improvement at that time unless he found a residual or recurrent disc herniation.

Unum notified McKeown on April 30, 2010 that his claim for long-term disability benefits had been approved, commencing on December 11, 2009 in the amount of $4,942.63 per month, subject to reevaluation based on updated medical information.

B.   *Reevaluation of McKeown's Medical Condition*

In June 2010, Unum requested updated certification of McKeown's continued disability.  In response, Unum received medical records from Dr. Freeman and Dr. Daniel Marin, a new specialist from whom McKeown had sought treatment.  Dr. Freeman indicated that an MRI scan taken on May 17, 2010 indicated that McKeown had good decompression with relatively routine post-operative changes.  The x-rays revealed mild to moderate loss of disc height at L5-S1, but there was no instability on dynamic testing.  Dr. Freeman stated:

> In summary, he is safe to go back to work without limitations from a surgical perspective only.  I do not see any limitations with relation to lifting or working from a spine perspective.
> Having said that, he is still walking with a cane, has residual pain, he has trouble twisting to the left, and may or may not be adequately stable for working on ships in rough conditions with heavy loads in waves of 20 feet or higher.  This is a complex disability question

that needs to be answered by a physiatrist with careful
knowledge as to his requirements at work as well as the
capability to do disability evaluations.

Dr. Marin added that he had seen McKeown twice and that
"[f]unctionally, the patient seems improved."  He stated that he
was not comfortable putting McKeown at MMI, and that "[i]n the
interim . . . it [is] prudent to give the patient a reprieve from
work until he is evaluated by a neurologist for his reports of
involuntary movements."  Dr. Marin recommended an epidural
steroid injection to improve McKeown's pain, which McKeown
received on June 3, 2010.  Dr. Marin also noted that McKeown
planned to move to Arizona, and that he would help McKeown locate
new doctors there.

Unum again requested updated medical information on August
13, 2010.  GulfMark advised Unum that it was evaluating McKeown's
condition, because GulfMark believed that McKeown should have
been able to return to work by now, and it would share any
results with Unum.  McKeown, now living in Arizona, sought
treatment from Dr. Brad Sorosky, who took an EMG of his lower-
left extremity on September 23, 2010.  The EMG came back
"normal," with no electrodiagnostic evidence of left lumbar
radiculopathy or other peripheral nerve pathology.

On October 5, 2010, Unum spoke with McKeown who stated that
GulfMark wanted him to return to New Orleans to see the company
doctor, Dr. Robert Bourgeois.  GulfMark requested Unum to take no

further action until McKeown was seen by Dr. Bourgeois.  On October 13, 2010, surveillance was conducted as McKeown traveled to New Orleans for a medical evaluation.  McKeown was observed pulling luggage into the airport while walking with normal gait, as well as bending, squatting, and lifting a small suitcase. Later in the day, however, he was observed approaching his medical appointment walking with a cane.  The following day, October 13, 2010, McKeown was observed returning to the medical clinic leaning heavily on a cane.  Notably, McKeown did not use the cane as he left the office, and, on October 14, 2010, he was observed returning to the airport without the use of a cane and walking with normal gait.

The MRI report ordered by Dr. Bourgeois on October 13, 2010 was unchanged from a previous MRI dated May 21, 2010.  As a result, Dr Bourgeois opined:  "Combined with his exam and behavior, I am not impressed.  What minimal changes there are do not correlate with his evaluation.  His complaints and findings are not physiologic."  McKeown told Dr. Bourgeois that he would follow up with Dr. Randall Porter, a neurologist in Arizona.

On November 1, 2010, Unum received an attending physician statement dated September 23, 2010 from Richard Waldrop, a family practitioner.  Dr. Waldrop stated that McKeown's diagnosis was neuropathy and lumbar disc disease.  According to Dr. Waldrop, McKeown could occasionally lift up to ten pounds, but he could

not climb, twist, bend, or stoop. He noted that it was uncertain as to when his functional capacity would improve.

Unum conducted more surveillance on November 1, 2010 and November 4, 2010. McKeown was observed traveling to a hardware store, pawn shop, and car wash. At the car wash, McKeown was seen using the self-service vacuums, vacuuming his entire vehicle from front-to-back and door-to-door. He then traveled to a wrecking yard where he remained for over one hour before leaving for the grocery store, where he pushed a shopping cart, purchased groceries, and loaded items into his car. In total, he was out of the house for approximately four hours. On November 4, 2010, he was observed doing yard work at his home, using a shovel and a gardening rake. In addition, he was seen holding a bag of gardening material and moving a wheelbarrow. He was also observed walking, standing, bending, and lifting a bicycle out of a vehicle.

Contrary to the surveillance videos, McKeown painted a different picture in his daily activities log. In a log dated November 5, 2010, McKeown stated that the most important activity he engaged in on a daily basis was making sure that he took his pain medication on time, because failure to do so rendered him immobile for the rest of the day. He also stated that he gets out of the bed with the assistance of his fiancee, and that he spends six to eight hours a day resting, occasionally stretching. In addition, he provided that he spends one to two hours a day on

light yard work or assisting in household chores.  The most painful activity, according to McKeown, was running errands, which requires him to carry a memory foam pillow to help cushion the bumpy car ride.  Moreover, riding in a car for more than fifteen to twenty minutes can cause severe pain.  At times, just getting in the car can be "sheer agony."  Finally, he described the forty-five minutes spent on personal hygiene as extremely painful.

On November 19, 2010, Unum spoke with Dr. Bourgeois, who stated that he had not seen anything medically that would preclude McKeown from returning to work, and that he would review the information from Dr. Porter once he received it.  Unum received a physician statement from Dr. Porter on November 29, 2010, which diagnosed McKeown with postlaminectomy syndrome, evidenced by low back and leg pain.  Dr. Porter instructed McKeown to refrain from heaving lifting, twisting, or bending. He also recommended that McKeown be fitted for a spinal cord stimulator.  Unum later confirmed with Dr. Porter that McKeown had the capacity to perform employment, so long as it was within the restrictions and limitations instructed by Dr. Porter.

McKeown had the spinal cord stimulator implanted, on a trial basis, on January 7, 2011.  Consequently, he reported that his pain improved by fifty percent.  He also said that he was more active and required less pain medication.  McKeown was instructed to follow up with Dr. Porter for a permanent spinal cord

stimulator.

After the spinal cord implantation, a vocational consultant performed another occupational analysis on January 18, 2011, reviewing all relevant medical and vocational information in McKeown's file.  The analysis identified McKeown's occupation as a Master Bays Sound & Lakes (Ship Master; Ship Captain).  The consultant concluded that the demands of McKeown's occupation did not exceed the restrictions and limitations noted by Dr. Porter. Accordingly, on January 25, 2011, Unum notified McKeown that he was no longer eligible to receive long-term disability benefits under the policy.  The notification letter identified the physical requirements of McKeown's occupation as performed in the national economy and noted that the restrictions and limitations provided by Dr. Porter did not preclude him from performing those duties.

C.  *Unum's Post-Termination Supplemental Review and McKeown's Appeal*

Although Unum terminated McKeown's benefits as of January 25, 2011, it began a supplemental review of his file because McKeown's job description proved to be a problem yet again.[1]

---

[1]   Unum also received an updated report from Dr. Bourgeois in February 2011, which, unlike the job description, was consistent with previous medical reports.

Dr. Bourgeois advised Unum that he reviewed all of McKeown's medical records (including those of Drs. Sorosky and Porter), the video surveillance, and the surveillance reports.  He concluded that the surveillance raised questions about McKeown's subjective

On February 21, 2011, Unum received notification from David Darling, Vice President of Human Resources for GulfMark, advising that the second job description that had been provided to Unum was also inaccurate.  Darling stated that because GulfMark's vessels sailed with only eight crew members, the captains were very "hands on" in terms of loading and unloading supplies, which typically requires movement up and down stairs throughout the day.  It also sometimes involves hooking up hoses and crawling around in the "tank farm."

Unum requested another revised job description.  The new job description indicated, among other things, that McKoewn was frequently required to lift ten pounds and occasionally required to lift eighty pounds.  It also noted that a captain is required to transport freight and cargo.

Based on this new information, the vocational consultant concluded that McKeown's occupation, as performed in the national economy, was most consistent with the enhanced DOT definition of "Boat Captain," whose primary duty is commanding a boat to

---

complaints, because McKeown's activities in the videos were not consistent with his complaints.  For example, in one video McKeown is seen leaving a medical building in a slow, deliberate gait; however, in another video he is seen performing landscaping activities in his front yard for a significant period of time. Dr. Bourgeouis indicated that he was curious whether Dr. Porter would have still recommended the spinal stimulator if he had seen the surveillance videos.  In conclusion, Dr. Bourgeouis stated that McKeown was physically able to perform the duties of a merchant mariner, and that the implanted spinal cord stimulator should lessen his need for pain medication.

transport passengers, freight, and other cargo across oceans, bays, lakes, and coastal waters.  The job is defined as "medium work," which requires lifting, carrying, pushing, and pulling of twenty to fifty pounds occasionally, ten to twenty-five pounds frequently, and up to ten pounds constantly.  Unum spoke again to David Darling, regarding McKeown's return to work.  Darling stated that because McKeown was master of the ship, he could delegate any activities to other crew members; however, he noted that "it looks better when the master works with the crew."

On May 13, 2011, Unum provided Dr. Bourgeouis with the new job description, and asked him to provide an updated opinion as to whether McKeown was capable of performing the duties listed in the new description.  Dr. Bourgeouis responded that he believed McKeown was capable of physically performing the tasks.

Unum also followed up with Dr. Sorosky on May 19, 2011.  Dr. Sorosky stated that he performed an EMG on McKeown on May 17, 2011, which reported as normal.  Dr. Sorosky asked to see Dr. Bourgeouis' report and the surveillance videos.  Dr. Sorosky also mentioned that McKeown had requested referral to a new pain management facility; however, because Dr. Sorosky is a pain management physician, he told McKeown that he does not refer patients to other pain management physicians.

On June 11, 2011, a functional capacity examination (FCE) was performed by Dr. Murray Palmer with Advanced Medical Specialists, which concluded:

12

> The client's self-limitations were greater than the
> objective findings support.  His functional tolerances,
> as documented on the surveillance videotape, is
> significantly greater than what he demonstrated in the
> clinic.  This FCE is not considered to be a valid
> indicator of the client's current functionality.  It does
> represent a minimal level of activity the clients can do.

Further, the report noted that "[t]he client's reporting was not
found to be consistently reliable" regarding pain and disability.

In terms of physical demand level, Dr. Palmer stated:

> The client can do the following safely and in high
> probability can do even more than this:  Occasionally
> lifting of 30 lbs floor-overhead and 40 lbs knee-waist;
> occasionally carry up to 40 lbs and occasionally
> push/pull up to 45 lbs force.  He can repetitively lift
> 20 lbs floor-waist and 15 lbs to shoulder level.

In conclusion, the FCE determined that McKeown had
sedentary/light functioning with some medium abilities, and that
he was capable of performing the duties of boat captain at pain
levels that would not limit his performance, provided that he
could delegate the loading of supplies that he felt were too
heavy.

On July 27, 2011, Unum's on-site physician, Dr. Tammy
Lovette, contacted Dr. Sorosky to further discuss McKeown's
physical capacity.  Dr. Sorosky stated that he usually deferred
to the FCE.  In addition, he noted that he had reviewed the video
surveillance and "it looks like he can do a lot but I can't say
he doesn't have good days and bad days."  Dr. Lovette also spoke
with Dr. Porter who stated that he was no longer actively
treating McKeown, but from the standpoint of the spinal

13

stimulator, Dr. Porter saw no problem with McKeown's ability to perform medium-level work.

Dr. Lovette conducted a review of McKeown's file to assess the conclusions of the FCE examiner regarding the minimum activity level.  Dr. Lovette concluded that McKeown appeared to have the physical capacity for work at a higher level than light. In addition, he felt that McKeown could perform job duties greater than those listed in the FCE:

> I find no support for [restrictions/limitations] that would preclude the following activities at this time: [l]ifting, [c]arrying, [p]ushing, [p]ulling 20 - 50 Lbs. occasionally, 10-25 Lbs. frequently or up to 10 Lbs. constantly.

Because Dr. Lovette's assessment concluded that McKeown's physical abilities exceeded those outlined in the FCE, his file was reviewed by a second physician, Dr. Susan Council.  Dr. Council noted that while the possibility of a small disc herniation was still seen on post-surgery MRI scans, the electromyography results were normal.  She also observed that medical testing did not demonstrate a cause for his complaints: neurological examinations were reported as normal and McKeown had demonstrated fairly significant abilities in video surveillance. Dr. Council agreed with Dr. Lovette as to the reasonable restrictions and limitations regarding McKeown's physical abilities.

After the assessments by Drs. Lovette and Council, another occupational analysis was performed, which concluded that the

demands of McKeown's occupation, as performed in the national
economy, did not exceed the restrictions noted in the reviews by
both doctors.  That is, McKeown's job duties did not require him
to perform tasks outside these limits:  lifting, carrying,
pushing, and pulling twenty to fifty pounds occasionally; ten to
twenty-five pounds frequently; or up to ten pounds constantly.

Based on the third amended job description provided by
GulfMark and the results of the FCE, Unum reevaluated its
previous decision terminating benefits as of January 24, 2011,
and decided to reinstate disability benefits.  Before Unum
communicated this decision, McKeown notified Unum on September 7,
2011 that he was appealing Unum's original January 2011
termination decision.  McKeown submitted additional documents:
(1) several letters from Cornelius Gorman, a vocational
consultant with a PhD; (2) literature from Medtronic on Medtronic
Titan Model 3550-39 spinal stimulator, which was recalled in
2009; (3) medical records from Dr. Azmi Nasser; (4) approximately
seventy pages of documents published by the U.S. Coast Guard
relating to medical and physical evaluation guidelines for
merchant marine credentials; and (5) an affidavit by McKeown
dated September 7, 2011.  The appeal letter stated that Unum
wrongfully terminated McKeown's benefits, and that the "narcotic
medication" that McKeown takes precludes him from working under
the Coast Guard guidelines.

Two days later, on September 9, 2011, Unum notified McKeown

that it had reevaluated its decision to terminate benefits as of
January 24, 2011 based on the amended job description and the
FCE, and that the benefits should not have been terminated in
January 2011.  Unum concluded, however, that McKeown was not
precluded from performing the duties of his occupation beyond
August 1, 2011.  Therefore, McKeown was entitled to an additional
$30,809.06 in benefits for January 24, 2011 through August 1,
2011.  Unum also advised McKeown that it would consider the
additional information provided, and that McKeown would have new
appeal rights and deadline following the amended decision.  On
March 6, 2012, McKeown requested an appeal of the amended
decision that provided additional benefits through August 1,
2011.

D.   _McKeown's Second Appeal and Legal Recourse_

      In deciding McKeown's appeal for the August 1, 2011
termination date, Unum considered the supplemental materials
provided by McKeown.

      First, McKeown provided letters from Dr. Cornelius Gorman, a
vocational consultant.  In a letter dated September 6, 2011, Dr.
Gorman opined:

> Mr. McKeown may be a surgical candidate given the
> reported malfunction of his Medtronics spinal implant.
> He requires multiple medications with impairment to CS
> activity and daily functioning. He has been prescribed a
> long acting narcotic (Oxycodone) and given all of his
> medical difficulties is not a candidate for his former
> profession as a seagoing Captain . . . .
>           . . . .

16

> Mr. McKeown cannot perform all of the activities of daily
> living independent of others.  He reports a history of
> falling unexpectedly and head/fall protection measures
> are necessary.  He cannot meet the minimum standards of
> service as a vessel captain due to danger to self as well
> as to others and to equipment. . . .
> . . . .
> The patient has been prescribed and utilizes a long-
> acting opiate.  This too is incompatible with Coast Guard
> regulations, applicable legislation, and the requisites
> of captaincy.

In another letter dated September 7, 2011, Dr. Gorman assumes a "positive post-surgical outcome" and states that "[w]ithout question, captaincy is now a lost occupation for this man and made worse by the less than desirable surgical outcome and continuing need for medications.  No employment is possible as of this writing and suggestions to the alterative are invalid."  He also indicated that patients with spinal cord stimulators cannot drive, lift over five pounds, or lift their arms above the head.

Second, McKeown included an October 2009 notification to health care professionals regarding the model 3550-39 Titon Anchor spinal cord stimulator manufactured by MedTronic.  The notice warned that MedTronic had  received numerous reports of separation of the titanium insert from the silicone body of the anchor, and advised that a modified anchor would be available for distribution by November 2009, which is when the existing Titan anchor would no longer be distributed.

Third, McKeown submitted medical records and a physician statement from Dr. Azmi Nasser, a pain management physician, who stated that he began treating McKeown in June 2011.  Dr. Nasser

indicated that he treated McKeown with trigger point injections, medical branch blocks, radiofrequency neuroablations, and steroid injections for joint pain and radicular pain not successfully covered by the spinal cord stimulator. According to McKeown, these procedures have provided him with some pain relief. In addition, Dr. Nasser stated:

> We have also maintained him on few medications. I think it is also important to note that Mr. McKeown is not taking strong opioid medication and trying to manage his pain as much as possible without medication.
> . . . .
> 1. Regarding employment, I do believe he can sustain employment and is not totally disabled.
> 2. I would limit him to sedentary work, with restrictions no lifting greater than ten pounds occasionally, no bending and twisting, and with the ability to change position every 30-60 minutes for at least 5 minutes.
> 3. I do not believe his current medications will significantly affect his ability to function throughout the day.
> 4. I do not feel he can execute the job description provided by Unum.

Fourth, McKeown submitted approximately seventy pages of medical and physical guidelines published by the U.S. Coast Guard. McKeown asserts that the guidelines support a finding that McKeown "must be capable of performing various activities including climbing up and down vertical ladders and stairways, lifting, pulling, pushing, and carrying a load, kneeling and snooping, crawling, carrying and handling firehouses and fire extinguishers, as well as various other activities."

Fifth, McKeown provided an affidavit, in which he attests to being unable to carry or lift anything above five pounds, unable

to stand for any length of time over fifteen minutes, and unable to sit for more than twenty minutes or walk for more than ten minutes.  He also included a list of his job duties.

In response to the materials submitted by McKeown, Dr. Charles Sternbergh, a neurosurgeon, conducted a review for Unum. Dr. Sternbergh noted McKeown's post-surgical complaints of pain had been evaluated by multiple medical professionals, none of whom identified, after multiple lumber MRI scans and electrophysiological testing, significant neurological abnormalities or progressive anatomic or physiological changes. After reviewing the record and the surveillance films, Dr. Sternberg opined that McKeown was exaggerating his symptoms.  He concluded that McKeown could sustain medium-level work, with accommodations so that he can reposition himself from sitting to standing every one to two hours.  He also imposed a lifting limitation of fifty pounds occasionally.

On June 12, 2012, Dr. Sternbergh wrote to Dr. Nasser, (McKeown's current treating physician) outlining his conclusions, and asking Dr. Nasser to provide comments within ten days.  Dr. Nasser replied that he would like to review the surveillance videos and the report, which were provided again to Dr. Nasser; however, Dr. Nasser failed to respond within the requested time frame.

Therefore, on July 10, 2012, Unum notified McKeown that it was upholding its previous decision to terminate benefits as of

19

August 1, 2011.  In support of its decision, Unum detailed the
surveillance videos, pointing out that McKeown's actions
evidenced functional capacities in excess of what was being
reported.  Further, Unum noted that Dr. Soroksy stated that the
spinal cord stimulator did not interfere with McKeown's ability
to perform medium-level work.  The Unum physicians also concluded
that he was capable of exerting twenty to fifty pounds
occasionally, ten to fifteen pounds frequently, and up to ten
pounds constantly.  In addition, the doctors found that he was
able to sit, stand, climb, squat, kneel, and crawl with no
restrictions on the upper extremities.  After multiple revised
job descriptions, Unum's vocational consultant concluded that the
demands of McKeown's occupation of boat captain, as performed in
the national economy, did not exceed his medical restrictions.
Unum also noted the conflicting medical opinions:  Dr. Nasser
stated that McKeown could only engage in sedentary work, but Dr.
Bourgeois opined that McKeown could work in his regulation
occupation as boat captain.  Unum found, however, that Dr.
Nasser's opinion was inconsistent with exams, diagnostic studies,
and the opinions of all other physicians seen by McKeown.  In
addition, Unum had attempted to discuss its findings with Dr.
Nasser, but to no avail.

     Unum also addressed the issues raised on appeal.  It found
that McKeown's contention that the spinal cord stimulator
prevented him from working was contrary to Dr. Porter's opinion

that the stimulator would not be an impediment to McKowen, and Dr. Bourgeoius' statement that the device should obviate the need for pain medication.  McKeown's affidavit regarding his extreme physical limitations was inconsistent with independent observations of his activities and capabilities.  His claim of failed back surgery was also unsupported by medical records. Further, Unum was not persuaded by Dr. Gorman's opinion because (1) he had never examined McKoewn; (2) he had never reviewed the video surveillance; and (3) his opinion was conflicting with all other medical opinions provided.

After Unum's decision to uphold the termination, Dr. Nasser replied to Unum on July 12, 2012.  Dr. Nasser conceded that McKeown's activities in the videos were inconsistent with his report, but he felt that McKeown did exhibit spine-guarding behavior by squatting for relief and leaning forward on objects. He noted that some of the footage raised concerns about McKeown's activity tolerance, but stated that it is not uncommon for patients with back pain to have good days and bad days.  Notably, Dr. Nasser agreed that McKeown was capable of performing more than sedentary work as he had previously believed, stating that it was more reasonable to try a light-duty setting, which limits lifting to twenty-five pounds occasionally, bending without twisting occasionally, changing positions at least every sixty minutes, and resting for five minutes.

As a result of Dr. Nasser's response, a vocational expert

reviewed McKeown's file again, determining that it would be reasonable to conclude that the physical demands of McKeown's occupation would not exceed the level of work as described in the restrictions and limitations noted by Unum's physicians.  On July 18, 2012, Unum notified McKeown that it has received and considered Dr. Nasser's response, but it was insufficient to alter Unum's determination.

On August 8, 2012, McKeown sued Unum in this Court, alleging Unum wrongfully declared that McKeown is not entitled to disability benefits under the insurance policy.  Unum now moves for summary judgment on the administrative record, asserting that there is no genuine issue of material fact that its decision to terminate McKeown's benefits was not an abuse of discretion.

## I.  Legal Standards

### A.

### Standard for Summary Judgment

Federal Rule of Civil Procedure 56 instructs that summary judgment is proper if the record discloses no genuine issue as to any material fact such that the moving party is entitled to judgment as a matter of law.  No genuine issue of fact exists if the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.  See Matsushita Elec. Indus. Co. v. Zenith Radio., 475 U.S. 574, 586 (1986).  A genuine issue of fact exists only "if the evidence is such that a

reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The Court emphasizes that the mere argued existence of a factual dispute does not defeat an otherwise properly supported motion. See id. Therefore, "[i]f the evidence is merely colorable, or is not significantly probative," summary judgment is appropriate. Id. at 249-50 (citations omitted). Summary judgment is also proper if the party opposing the motion fails to establish an essential element of his case. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). In this regard, the non-moving party must do more than simply deny the allegations raised by the moving party. See Donaghey v. Ocean Drilling & Exploration Co., 974 F.2d 646, 649 (5th Cir. 1992). Rather, he must come forward with competent evidence, such as affidavits or depositions, to buttress his claims. Id. Hearsay evidence and unsworn documents do not qualify as competent opposing evidence. Martin v. John W. Stone Oil Distrib., Inc., 819 F.2d 547, 549 (5th Cir. 1987). Finally, in evaluating the summary judgment motion, the Court must read the facts in the light most favorable to the non-moving party. Anderson, 477 U.S. at 255.

*B.*

ERISA Abuse of Discretion Standard

ERISA "permits a person denied benefits under an employee benefit plan to challenge that denial in federal court." Metro.

Life Ins. Co. v. Glenn, 554 U.S. 105, 108 (2008) (citing 29 U.S.C. § 1001; § 1132(a)(1)(B)).   When reviewing a denial of benefits made by an ERISA plan administrator, the Court applies a de novo standard of review, "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989). Here, the long-term disability policy clearly empowers Unum with discretionary authority to determine eligibility for benefits and to construe the long-term disability plan's terms.   Accordingly, this Court must apply an abuse of discretion standard to review Unum's decision to terminate Mr. McKeown's long-term disability benefits.   Id.   The claimant has the burden of proof under ERISA to show that the administrator abused its discretion.   Ellis v. Liberty Life Assurance Co. of Boston, 394 F.3d 262, 273 (5th Cir. 2005).

Under the abuse of discretion standard, the Court must determine whether the administrator's decision was "arbitrary and capricious." Anderson v. Cytec Indus., Inc., 619 F.3d 505, 512 (5th Cir. 2010).   A decision is arbitrary only if made "without a rational connection between the known facts and the decision or between the found facts and the evidence." Bellaire Gen. Hosp. v. Blue Cross Blue Shield, 97 F.3d 882, 828 (5th Cir. 1996).

In addition, the administrator's decision must be supported

by substantial evidence.  See Ellis, 394 F.3d at 274 (5th Cir. 2005).  "The law requires only that substantial evidence support a plan fiduciary's decision, not that substantial evidence exists to support the employee's claim of disability."  Id.  The Fifth Circuit instructs that "[i]f the plan fiduciary's decision is supported by substantial evidence and is not arbitrary or capricious, it must prevail."  Corry v. Liberty Life Aussurance Co., 499 F.3d at 397-98 (quoting Ellis, 394 F.3d at 273)).  "Substantial evidence is more than a mere scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Id. at 398.  Ultimately, the Court's review of the administrator's decision "need not be particularly complex or technical; it need only assure that the administrator's decision fall somewhere on a continuum of reasonableness–even if on the low end."  Id. (quoting Vega v. Nat'l Life Ins. Serv., Inc., 188 F.3d 287, 297 (5th Cir. 1999) (en banc)).

    Moreover, the Court must measure the conflict of interest that arises from the dual role of an entity acting as an ERISA plan administrator and also as a payer of plan benefits, as a factor in determining whether the plan administrator has abused its discretion in terminating benefits.  See Glenn, 554 U.S. at 112-13.  However, if a claimant presents no other evidence (other than the company's dual role) as to the degree that a conflict

25

exists and affects the decision to terminate benefits,[2] the Court reviews the administrator's decision "with only a modicum less deference than [it] otherwise would." Corry, 499 F.3d at 398 (quoting Vega, 188 F.3d at 301).  Because McKeown has presented no evidence to establish any conflict beyond the mere duality of Unum's role, the Court reviews Unum's decision with substantial deference.

## II. Discussion

Unum asserts that summary judgment on the administrative record is appropriate.  In response, McKeown contends that Unum's decision to terminate his long-term disability benefits was arbitrary and capricious because Unum (1) failed to properly consider his actual job duties; (2) discounted his subjective complaints; and (3) ignored his treating physicians and objective evidence.  Therefore, McKeown submits that summary judgment is precluded.  Based on the administrative record before it, the Court finds summary judgment in favor of Unum is proper, and the Court addresses each of McKeown's contentions in turn.

### A.

McKeown first submits that Unum failed to take into account his actual job duties as a captain.  Specifically, McKeown alleges that the position of captain is a "heavy duty job."  He

---

[2] The plaintiff bears the burden to submit evidence that the company's decision was actually tainted by self-interest.  See Corry, 499 F.3d at 398.

contends that the job involves participating in the loading and
unloading procedures, which requires him to climb stairs multiple
times a day.  He also performs tasks such as "hooking up hoses
and crawling in a tank farm."  The job of captain also requires
him to maintain the upkeep of the vessel, hull, masts, decks,
bulkheads, ladders, superstructures, and accommodations; stand
lookout; and assist in mooring and anchoring the vessel.

The Court does not find that Unum failed to properly
consider McKeown's actual job duties.  To the contrary, Unum
worked with McKeown and GulfMark in obtaining an accurate job
description.  For example, in Unum's initial telephone interview
on March 12, 2010, McKeown told Unum that his job duties exceeded
those outlined in Unum's vocational analysis, which was based on
the job description provided by GulfMark.  As a result, Unum
followed up with GulfMark, who agreed with McKeown regarding his
job duties, and provided Unum with an updated job description.
Unum conducted an updated vocational analysis using GulfMark's
new job description on April 5, 2010, and concluded that McKeown
was entitled to long-term disability benefits.  Further, after
Unum terminated McKeown's benefits, it conducted a supplemental
review because GulfMark notified Unum that the second job
description was also inaccurate.  David Darling, GulfMark's Vice
President of Human Resources, expressly told Unum that because
GulfMark's vessels only sailed with eight members, the captains
were very "hands on."  Darling conveyed to Unum the same job

duties that McKeown cites in his opposition memorandum:  captains
load and unload supplies, climb stairs, hook up hoses, and crawl
in the tank farm.  GulfMark provided Unum with, yet again, a
third revised job description.  Based on this new information,
Unum performed another vocational analysis.  Unum also provided
McKeown's physicians with the new job description, requesting an
opinion as to whether McKeown was capable of performing the tasks
listed.

Other than summarily concluding that Unum did not consider
his actual job duties, McKeown fails to point to any evidence in
the record to support his assertion, and glosses over Unum's
efforts in ensuring that it had the correct job description.
Further, McKeown's reliance on Rucker v. Life Insurance Co. is
unpersuasive.  No. 10-3308, 2012 WL 956507 (E.D. La. Mar. 20,
2012).  In Rucker, the plaintiff was a ceramics professor at a
local university, a position that required regular lifting of a
minimum of fifty pounds and a maximum of 100 pounds.  Id. at *11.
The plaintiff was often required to prepare 200-pound batches of
clay prior to each class.  Id.  The administrator in Rucker
determined that plaintiff's job required lifting twenty to fifty
pounds occasionally, ten to twenty-five pounds frequently, and up
to ten pounds constantly.  Id. at *10.  The court found that the
administrator failed to take into consideration the plaintiff's
actual job duties:  for instance, rather than lifting up to fifty
pounds occasionally, plaintiff's employer stated that the

position required him to lift a minimum of fifty pounds "100% of the time." Id. at *12.

Here, GulfMark's third job description advised Unum that the position of captain includes lifting ten pounds frequently and up to eighty pounds occasionally. Unum's vocational analysis defined McKeown's job as "medium work," which requires lifting ten pounds constantly, ten to twenty-five pounds frequently, and up to fifty pounds occasionally. Unlike the stark differences in Rucker, Unum's description is not so incongruous as to constitute an abuse of discretion. See Robinson v. Aetna Life Ins. Co., 443 F.3d 389, 396 (5th Cir. 2006) (explaining that the correct interpretation of the "own occupation" standard is the occupation in the general economy, as opposed to a specific job for a specific employer). Notably, and unlike the administrator in Rucker, the record indicates that Unum went back and forth with GulfMark regarding McKeown's job description. McKeown highlights no evidence to indicate that Unum was arbitrary and capricious in determining McKoewn's job duties.

*B.*

McKeown also submits that Unum ignored his subjective complaints of pain, relying instead on its own doctors who stated that McKeown's complaints did not correlate with the objective evidence. The Court notes that an administrator cannot simply disregard subjective complaints of pain. See, e.g., Audino v.

29

Raytheon Co. Short Term Disability Plan, 129 F. App'x 882 (5th
Cir. 2005) (recognizing that pain cannot always be objectively
quantified and noting that the Fifth Circuit has faulted
administrators for focusing on tests, rather than pain and its
effect).  The record, however, does not indicate that Unum did so
here.

Unum obtained surveillance videos that directly contradicted
McKeown's complaints of pain:  he was observed vacuuming the
entire inside of his vehicle, loading and unloading groceries,
lifting a bicycle out of a vehicle, and doing yard work that
included holding a bag of gardening material and pushing a
wheelbarrow.  Perhaps even more troubling is the surveillance
videos that show McKeown traveling to New Orleans for medical
appointments:  while traveling in the airport he was observed
pulling luggage, bending, squatting, lifting a small suitcase,
and walking with normal gait without a cane; however, later in
the day, while entering the medical building for his appointment,
he was seen leaning heavily on a cane, only to later be observed
leaving the appointment and returning to the airport, once again
without the use of a cane and walking with normal gait.
Noticeably, McKeown fails to address or to rebut the surveillance
videos in his submission papers to the Court.

It is also helpful to note that numerous physicians with
whom McKeown consulted have opined that there is nothing about
his back condition that would prevent him from returning to work

with certain limitations.  Dr. Lovette concluded that "I find no
support for [restrictions/limitations] that would preclude the
following activities at this time:  [l]ifting, [c]arrying,
[p]ushing, [p]ulling 20-50 Lbs. occasionally, 10-25 Lbs.
frequently or up to  10 Lbs. constantly."  Contrary to McKeown's
assertion, physicians who examined McKeown, and who are not
employed by Unum, also reached similar conclusions.  For
instance, Dr. Freeman, the surgeon who performed the back
surgery, stated that McKeown would be able to return to "full
duty" five months post-surgery.[3]  Dr. Robert Bourgeois reported
to Unum:  "Combined with his exam and behavior, I am not
impressed.  What minimal changes there are do not correlate with
his evaluation.  His complaints and findings are not
physiologic."  Dr. Porter who had recommended the spinal cord
stimulator, indicated that he saw no problem with McKeown's
ability to perform medium-level work from the standpoint of the
spinal cord stimulator.  Moreover, the FCE report concluded that
McKeown's "self-limitations were greater than objective findings
support," and that his functional tolerances were "significantly
greater than what he demonstrated in the clinic."

The Court cannot conclude, based on the administrative
record, that Unum arbitrarily and capriciously ignored McKeown's

---

[3] Dr. Freeman further stated that "he is safe to go back to work
without limitations from a surgical perspective only.  I do not
see any limitations with relation to lifting or working from a
spine perspective."

subjective complaints of pain.  As one court has soundly
observed, "where the plaintiff's claimed disability stems largely
from [his] subjective representations of pain and physical
limitations, [his] credibility is paramount," and, "the
subjective nature of plaintiff's complaint necessarily require[s]
that the medical inquiry be intertwined with judgments about
plaintiff's credibility, which are reserved to the discretion of
the administrator."  Rizzi v. Hartford Life and Accident Ins.
Co., 613 F. Supp. 2d 1234, 1234, 1239 (D.N.M. 2009).

*C.*

Last, McKeown contends that Unum also ignored his treating
physicians and objective evidence.  The U.S. Supreme Court has
counseled:

> Nothing in [ERISA] itself . . . suggests that plan
> administrators must accord special deference to the
> opinions of treating physicians.  Nor does [ERISA] impose
> a heightened burden of explanation on administrators when
> they reject a treating physician's opinion.
>     . . . .
>     Plan administrators, of course, may not arbitrarily
> refuse to credit a claimant's reliable evidence,
> including the opinions of a treating physician.  But . .
> . courts have no warrant to require administrators
> automatically to accord special weight to opinions of a
> claimant's physician; nor may courts impose on plan
> administrators a discrete burden of explanation when they
> credit reliable evidence that conflicts with a treating
> physician's evaluation.

Black & Decker Disability Plan v. Nord, 538 U.S. 822, 831, 834
(2003) (citations and footnotes omitted).  McKeown asserts that

32

Unum refused to consider Dr. Nasser's opinion even though he was
the "only doctor still following the plaintiff."  Dr. Nasser
suggested that plaintiff should be restricted to sedentary work,
with restrictions on lifting greater than ten pounds
occasionally, no bending or twisting, and with the ability to
change position every thirty to sixty minutes.  In addition, Dr.
Nasser expressly stated that "[i]t is also important to note that
Mr. McKeown is not taking strong opioid medication."

Dr. Nasser's opinion, however, was inconsistent with the
other materials McKeown provided Unum during the appeals process.
McKeown also submitted letters and a report by vocational expert
Dr. Cornelius Gorman.  Dr. Gorman stated that McKeown "requires
multiple medications" to function daily, and that he "utilizes a
long-acting opiate" which is "incompatible with Coast Guard
regulations, applicable legislation and the requisites of
captaincy."

Further, Dr. Nasser's opinion was in conflict with almost
all other opinions of the physicians and the objective evidence.
As previously mentioned, two post-surgery EMG studies were
reported as normal, two MRI scans revealed minimal changes, and
the electromyography results were normal.  Although some of the
doctors were no longer treating McKeown, after reviewing
McKeown's medical records and the surveillance videos, Dr.
Bourgeouis, Dr. Sorosky, Dr. Porter, Dr. Lovette, Dr. Council and
Dr. Strenbergh all indicated that McKoewn was capable of

33

performing medium-level work.  This is in addition to Dr. Freeman's opinion that, from a surgical perspective, McKeown was able to return to work five months after surgery.  After watching the surveillance videos, even Dr. Nasser conceded that the videos "raised concerns" about McKeown's activity tolerance levels. Unum's concerns were no less substantially raised.

The only other evidence in the record that McKeown points to is the positive results for "straight leg raising tests and Waddell's Axial Rotation tests," which McKeown submits are "indicators of pain," and Dr. Sorosky's limitations imposed in November 2010.  Even assuming that this is sufficient evidence to support McKeown's claim of disability, "the law requires <u>only</u> that substantial evidence support a plan fiduciary [or plan administrator]'s decisions, including those to deny or terminate benefits, not that substantial evidence, (or, for that matter, even a preponderance) exists to support the employee's claim of disability."  <u>Ellis</u>, 394 F.3d at 273 (emphasis added).  Based on the totality of the evidence in the administrative record, the Court finds that Unum's termination decision was not arbitrary and capricious and is supported by substantial evidence.

Accordingly, Unum's motion for summary judgment is GRANTED.

New Orleans, Louisiana, August 21, 2013

MARTIN L.C. FELDMAN
UNITED STATES DISTRICT JUDGE